NOT DESIGNATED FOR PUBLICATION

No. 118,558

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

ALPHONSO MONTGOMERY,
*Appellant*.

MEMORANDUM OPINION

Appeal from Johnson District Court; JAMES CHARLES DROEGE, judge. Opinion filed March 22, 2019. Affirmed.

*Caroline M. Zuschek*, of Kansas Appellate Defender Office, for appellant.

*Shawn E. Minihan*, assistant district attorney, *Stephen M. Howe*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before POWELL, P.J., LEBEN, J., and KEVIN BERENS, District Judge, assigned.

BERENS, J.: Alphonso Montgomery pleaded no contest to felony driving under the influence (DUI) and second-time possession of marijuana. Prior to sentencing, Montgomery filed a motion for dispositional or durational departure and a motion to withdraw his plea. The district court denied Montgomery's withdrawal of his plea and the request for dispositional departure but granted the durational departure and sentenced Montgomery to 24 months in prison. The district court also fined Montgomery $2,500 and ordered him to pay BIDS attorney fees. Montgomery appeals, arguing the district court erred by (1) denying his motion to withdraw plea, (2) failing to consider community

1

service as a method for payment of the fine, (3) imposing BIDS attorney fees, and (4) not departing enough. Finding no error by the district court, we affirm the district court's judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

On April 11, 2016, the State charged Montgomery with felony DUI; second-time possession of marijuana, a severity level 5 felony; and driving with a suspended license, a misdemeanor. The DUI charge would be Montgomery's 4th or subsequent DUI if convicted. The district court appointed Angela Keck to represent Montgomery. On April 21, 2016, Keck requested the district court set the case for a plea hearing on May 4, 2016. On May 4, 2016, Keck stated that the parties were in the process of plea negotiations but had not yet worked out a plea. The district court continued the hearing until May 27, 2016.

On May 27, 2016, Keck informed the court that Montgomery was accepted into both work release and a long-term treatment program called Therapeutic Community (TC). Keck also said that the State made a plea offer that week, but she had not had an opportunity to go over it with Montgomery. Accordingly, Keck requested that the case be set for a preliminary hearing on June 30, 2016. However, Keck also stated, "We're going to ask to set this for prelim, but . . . I wanted to let the Court know it may be a plea at that time." Montgomery was present at this hearing.

On June 30, 2016, Montgomery waived his right to a preliminary hearing and pleaded no contest to the felony DUI and second-time possession of marijuana charges. In exchange, the State dismissed the charge of driving with a suspended license. District Judge Stephen Tatum found Montgomery knowingly and voluntarily entered the pleas, accepted his pleas, and set a sentencing date of August 15, 2016.

2

On August 14, 2016, Keck filed a motion for a dispositional or durational departure on Montgomery's behalf. The next day, Keck moved to withdraw as Montgomery's counsel because of a conflict of interest. Zane Todd was appointed to replace Keck.

After a series of defense continuances, Todd filed a motion to set aside Montgomery's plea on January 27, 2017. The motion, in its entirety, stated:

"Comes now the defendant, Alphonso Montgomery and states the following reasons to set aside the plea.
1.    Defendant was not allowed to review the entire video from his discovery.
2.    Defendant was not provided with all of his discovery.
3.    Defendant's Attorney failed to investigate the case fully.
4.    Defendant's requests for filing of Motion's [*sic*] was not granted.
5.    Defendant's calls were blocked.
6.    Defendant felt coerced into taking the plea."

At the hearing on January 30, 2017, Todd requested a continuance. Todd argued that Montgomery would have to get on the stand and make many of the arguments himself; Todd requested the continuance because Montgomery was on painkillers and the medication was "clouding" him. The State argued that it could not appropriately respond to the motion because the motion had no specificity and no legal grounds, despite the State having had five months to file its response. The district court requested that Todd amend the motion to at least provide a factual basis for the six claims. The district court then scheduled another hearing on the motion for March 23, 2017.

On March 21, 2017, the State filed its response to the motion to set aside Montgomery's plea. On March 22, 2017, Todd filed a memorandum in support of his motion to set aside Montgomery's plea. The memorandum provided the legal standard for

presentence plea withdrawal but did not provide any more facts beyond those alleged in the original motion.

On March 23, 2017, District Judge James Charles Droege held a hearing on the motion. Todd again requested a continuance, stating that the day before, Montgomery had requested more information that he did not have. The district court heard testimony from Keck and Montgomery but set over deciding on the motion until April 4, 2017, to allow the parties to get a transcript from the plea hearing and develop more legal arguments.

Montgomery testified that he did not have an opportunity to see all the evidence against him before entering his plea. He claimed that he was unable to watch one of the videos from his arrest and that Keck failed to properly investigate the case and did not interview witnesses. He testified that he was present during the plea negotiations between Keck and the State on June 30, 2016, and that the State said there would not be any other plea offers if he did not accept the one at hand. He testified that he felt threatened by the prosecutor when she said that there would be no further plea offers. He said he did not understand the plea agreement or its consequences. On cross-examination, he admitted that he had spoken with Keck about what he wanted to happen in the case, including screenings for TC and work release.

Keck testified that the State made multiple plea offers, and she explained each one to Montgomery. She counseled him not to accept the State's offer on the day of the scheduled preliminary hearing because she wanted more time to review the offer with him. She told Montgomery she could ask for a continuance in the case, but he declined because he wanted to plead that day so that he could get out of jail as soon as possible to be with his daughter. Keck testified that Montgomery did not mention feeling threatened.

4

Keck also testified that she explained the maximum possible sentence under the plea. She provided Montgomery with copies of the police reports from his arrest, and she watched the entire video of the stop with him. Keck admitted another video would not play, but that video contained only footage of Montgomery refusing to take a breath test at the police station, and Montgomery was not charged with any refusal crimes. She discussed pretrial motions with Montgomery, like challenging the legality of the stop, but said she did not usually file those motions until after the preliminary hearing. Finally, she testified that Montgomery did not ask her to interview anyone and that she did not typically get BIDS funding to investigate a case until after the preliminary hearing.

On April 4, 2017, the district court resumed its hearing on the motion. Todd argued that Montgomery should be allowed to withdraw his plea because his anxiety made the plea involuntary. The State argued that the transcript from the plea hearing showed the plea was knowingly and voluntarily made and that Montgomery had not shown good cause to withdraw the plea.

The district court held that, upon reviewing the file, the plea hearing transcript, and the parties' arguments, it found no reason to allow Montgomery to withdraw the plea. The district court denied the motion on the merits and proceeded to sentencing.

Montgomery requested a dispositional departure to placement at TC followed by work release. The State argued for a durational departure to 24 months in prison and opposed a dispositional departure because of Montgomery's lengthy history of drunk driving and his refusal to take accountability for his actions. Montgomery spoke to the court and said that he was taking accountability for his actions and that he was in therapy because he did not like who he was when he drank. The district court denied Montgomery's motion for a dispositional departure because of Montgomery's history of repeat DUIs. The district court granted Montgomery's motion for a durational departure and imposed a sentence of 24 months in prison for the possession conviction and 12

months in county jail for the DUI conviction to run concurrent followed by 12 months of postrelease supervision. The district court imposed a $2,500 fine for the DUI conviction and, from the bench, granted Montgomery 129 days of credit for time served. The journal entries of sentencing, both original and amended, however, state that Montgomery was awarded 213 days of credit.

The district court initially stated it was going to impose BIDS attorney fees for both Keck's and Todd's services, but Montgomery objected, citing *State v. Robinson*, 281 Kan. 538, 132 P.3d 934 (2006). He argued that he would be unable to pay the fees because he would be unable to work for the next 24 months under the sentence imposed. The district court noted that it would not waive all fees because Montgomery was able to post bond, had work skills, and was "going in for 24 months minus 20 percent" and would be back out and able to pay. Ultimately, the district court imposed only Keck's attorney fees.

Montgomery timely appeals.

I.      DID THE DISTRICT COURT ERR BY DENYING MONTGOMERY'S MOTION TO WITHDRAW HIS PLEAS?

Montgomery argues that the district court abused its discretion by denying his motion to withdraw his plea because no reasonable person would agree with its decision. He argues that he qualified for relief under each of the factors set forth in *State v. Edgar*, 281 Kan. 30, 36, 127 P.3d 986 (2006). He claims (1) he was not represented by competent counsel; (2) he was coerced into pleading; and (3) he did not understandingly and knowingly enter the plea.

Appellate courts apply an abuse of discretion review to a district court's decision on a presentence motion to withdraw a plea. *State v. White*, 289 Kan. 279, 284, 211 P.3d

6

805 (2009). A district court abuses its discretion if: (1) no reasonable person would adopt the view taken by the court; (2) the court bases its decision on an error of law; or (3) the court bases its decision on an error of fact. See *State v. Marshall*, 303 Kan. 438, 445, 362 P.3d 587 (2015). The party claiming that a court abused its discretion bears the burden of showing such an abuse. *State v. Robinson,* 303 Kan. 11, 90, 363 P.3d 875 (2015), *cert. denied* 137 S. Ct. 164 (2016). We may not "reweigh the evidence or assess witness credibility" when reviewing a district court's ruling on a motion to withdraw a plea. *State v. Anderson*, 291 Kan. 849, Syl. ¶ 3, 249 P.3d 425 (2011).

A defendant may withdraw a guilty plea before sentencing upon a showing of good cause. K.S.A. 2018 Supp. 22-3210(d)(1). District courts consider the *Edgar* factors to determine if a defendant has shown good cause. See *State v. Williams*, 290 Kan. 1050, 1053, 236 P.3d 512 (2010). These factors are nonexhaustive but establish a sound benchmark. See *State v. Garcia*, 295 Kan. 53, 62-63, 283 P.3d 165 (2012).

First, Montgomery argues that Keck was incompetent because she did not show him both videos, she failed to interview a witness he identified, she did not do a pre-preliminary hearing investigation, and she did not independently calculate his criminal history score.

At the hearing on the motion to set aside Montgomery's plea, Keck testified that the video Montgomery was unable to watch had no bearing on his case, as it was a refusal video from the police station and he was not charged with a refusal crime. Additionally, she testified that Montgomery did not ask her to interview anyone and that she did not typically receive BIDS funding to investigate a case until after the preliminary hearing. Significantly, Keck testified that she counseled Montgomery against taking the plea deal on the day it was offered, offering instead to seek a continuance of the preliminary hearing so that they had more time to discuss the plea offer, but Montgomery refused. Further, nothing presented at the plea withdrawal hearing suggested Keck failed to

7

independently calculate Montgomery's criminal history score prior to his plea. By stating that none of Montgomery's arguments for plea withdrawal had merit, the district court implicitly credited Keck's testimony over Montgomery's contradictory testimony. See, e.g., *Webster v. State*, No. 115,096, 2017 WL 2624340, at *3 (Kan. App. 2017) (unpublished opinion). Effectively, Montgomery asks us to reweigh evidence, which we cannot do. See *Anderson*, 291 Kan. 849, Syl. ¶ 3.

Montgomery next claims that he was coerced into pleading because of his anxiety. He alleged that "the prosecutor looked directly at him and stated no more plea deals would be offered, which caused him significant anxiety." At the plea withdrawal hearing, Keck testified that she knew about Montgomery's anxiety, but his only behavior that concerned her was his choice to take the plea that day rather than continue the case, which she attributed to his anxiety about wanting to get out of jail to be with his daughter. She also testified that Montgomery did not tell her he felt anxious or threatened by the State's conduct during plea negotiations. Further, the transcript from the plea hearing, which was before the district court when it ruled on the motion to withdraw, is relevant. There, Judge Tatum engaged in the following exchange with Montgomery:

"THE COURT: As you are here in court today, can you understand these proceedings?

"THE DEFENDANT: Yes.

"THE COURT: Can you understand what's going on in court?

"THE DEFENDANT: Yes.

"THE COURT: Is your mind clear today?

"THE DEFENDANT: Yes.

"THE COURT: Okay. You've been talking to your attorney, Ms. Keck; is that right?

"THE DEFENDANT: Yes.

"THE COURT: And asking her questions, getting answers about your case; is that right, a little bit of advice?

"THE DEFENDANT: Yes.

"THE COURT: Are you satisfied with her representation of you in this matter?

"THE DEFENDANT: Yes.

"THE COURT: That being said, is this your own choice to enter these pleas to these two counts, sir?

"THE DEFENDANT: Yes.

"THE COURT: Is anybody forcing you to do it against your will?

"THE DEFENDANT: No.

"THE COURT: It is solely your own choice; is that right?

"THE DEFENDANT: Yes, that's correct."

Judge Droege noted the thoroughness of this exchange in his ruling on Montgomery's motion to withdraw his plea:

"Judge Tatum made a number of inquiries into whether or not [Montgomery] was satisfied with his attorney's work, advice, whether he was entering the plea because of any coercions or being threatened and the—actually, it is a very clean hearing—a plea hearing and Judge Tatum, who has been doing this for 30 or 40 years, has gone through a very complete plea."

Further, Montgomery provides no authority to support his claim that his plea was coerced based on the facts of this case. We cannot find that no reasonable person would agree with the district court's finding that Montgomery's plea was not coerced in light of the above evidence and testimony.

Finally, Montgomery claims his plea was not made voluntarily, knowingly, and understandingly because of his testimony that he felt anxious and threatened by the State's declaration that there would be no further plea offers. The same evidence relevant to the previous claim is applicable here. Montgomery provides no authority to support his third claim. Again, we cannot conclude that the district court abused its discretion by finding that Montgomery's plea was made voluntarily, knowingly, and understandingly.

9

In sum, with respect to each of the factors highlighted by Montgomery on appeal, we find that the district court did not abuse its discretion. We cannot find that no reasonable person would agree with the district court's denial of Montgomery's motion to withdraw his plea.

II.     DID THE DISTRICT COURT ERR BY FAILING TO CONSIDER COMMUNITY SERVICE AS A METHOD OF PAYMENT FOR MONTGOMERY'S FINE?

Montgomery argues that the district court erred by imposing a fine of $2,500 without considering whether he could pay it off via community service. The State argues that this issue is moot, as the briefs were submitted in this case more than a year after the fine was imposed. The State further argues that should we reach this issue on the merits, Montgomery nevertheless fails because he was sentenced to 24 months in prison and there was no way he could have performed community service within one year after the fine was imposed.

"Interpretation and application of a statute is a question of law subject to an appellate court's unlimited review." *Nowicki v. Project Paint Research Labs*, 40 Kan. App. 2d 733, 739, 195 P.3d 273 (2008).

A mandatory fine of $2,500 is required for a fourth or subsequent DUI under K.S.A. 2018 Supp. 8-1567(b)(1)(E). However, the DUI statute also provides that in lieu of payment of the fine, the district court can order the defendant to perform community service to pay off the fine at a rate of $5 per hour. K.S.A. 2018 Supp. 8-1567(f). The Kansas Supreme Court has held that when this statute is read in conjunction with K.S.A. 2018 Supp. 21-6612 (formerly K.S.A. 21-4607[3]), "a district court must take into account the defendant's financial resources and the burden of the fine when considering the method of payment of a fine for a fourth or subsequent DUI offense, *i.e.*, whether the

defendant must pay a monetary fine or provide community service." *State v. Copes*, 290 Kan. 209, 223, 224 P.3d 571 (2010).

However, other panels of this court found that the *Copes* decision did not address the following language in K.S.A. 2018 Supp. 8-1567(f): "The community service ordered by the court shall be required to be performed not later than one year after the fine is imposed or by an earlier date specified by the court." See *State v. Grebe*, 46 Kan. App. 2d 741, 744, 264 P.3d 511 (2011), *rev. denied* 294 Kan. 945 (2012); *State v. Williams*, No. 103,338, 2010 WL 5490740, at *1 (Kan. App. 2010) (unpublished opinion). In applying this portion of the statute and the *Copes* decision, other panels have considered whether at the time of sentencing the district court could determine that the community service could be performed within one year of the date of sentence.

In cases where community service could not be performed within one year, other panels of our court have concluded there was no error when the district court failed to make the necessary consideration as to the method of the payment of the fine. See, e.g., *Grebe*, 46 Kan. App. 2d at 745; *State v. Gildersleeve*, No. 109,561, 2014 WL 802204, at *1 (Kan. App. 2014) (unpublished opinion); *State v. White*, No. 108,775, 2013 WL 3491299, at *2 (Kan. App. 2013) (unpublished opinion); *State v. Hausmann*, No. 106,756, 2012 WL 1524491, at *2 (Kan. App. 2012) (unpublished opinion); *cf. Williams*, 2010 WL 5490740, at *1 (concluding error was harmless).

In cases where the district court could readily determine that community service could be performed within one year, other panels have remanded the case for consideration as required under *Copes*. See, e.g., *State v. Valadez*, No. 115,991, 2017 WL 3001029, at *3 (Kan. App. 2017) (unpublished opinion) (finding district court erred by failing to consider community service as method of fine payment where Valadez received 77 days of jail-time credit, was eligible for 20% good-time credit, and was sentenced only to 13 months' imprisonment and 90 days' jail time); *State v. Bailey*, No. 110,936, 2014

WL 5849265, at *4 (Kan. App. 2014) (unpublished opinion) ("The district court sentenced Bailey to two concurrent terms of 9 months' imprisonment with the possibility of work release. . . . Accordingly, the district court was still required to consider the community service option at sentencing."); *State v. Kent*, No. 105,118, 2012 WL 308536, at *1 (Kan. App. 2012) (unpublished opinion) ("Because Kent will be serving his sentence in jail rather than prison, he may qualify for a work release program which would allow him to perform community service in lieu of a fine. Thus, the rationale of *Grebe* does not apply here."); *State v. Jefferson*, No. 106,265, 2012 WL 2045370, at *3 (Kan. App. 2012) (unpublished opinion) ("Jefferson received a 12-month jail sentence for his DUI conviction. Jefferson was also given credit for 17 days in county jail which reduced his sentence to just less than 1 year. Because Jefferson's sentence was slightly less than 1 year, there is a possibility that he could complete the community service within the 1-year time period. Therefore, we will not apply the *Grebe* rationale to this case.").

The State argues that the issue is moot because more than a year has passed since sentencing. However, this argument ignores the fact that the consideration of whether community service can be performed in one year from sentencing must be made by the district court based upon facts available at the time of sentencing. See *Copes*, 290 Kan. at 214. Therefore, we will consider the issue on its merits.

The parties agree that the district court did not consider the method of payment when it imposed the mandatory fine. The issue presented is whether Montgomery could have paid at least part of his fine via community service within one year of sentencing. The district court sentenced Montgomery to 24 months in prison for the possession conviction and 12 months in jail for the DUI conviction, with the sentences to run concurrent. The district court announced from the bench that it awarded Montgomery 129 days of jail time credit toward his sentence. However, both the original and amended sentencing journal entries state that Montgomery was awarded 213 days of incarceration

credit. No nunc pro tunc order appears in the record indicating an amendment to the amount of good time awarded from the bench, and nothing appears in the transcript of the sentencing hearing beyond the judge's announcement that Montgomery would get 129 days' credit. The parties do not address this discrepancy in their briefs. Montgomery simply states that he was awarded 213 days of jail credit but provides a citation to a completely unrelated page in the record. The State does not mention jail time credit at all.

"Awarding or calculating jail credit is part of imposing the sentence and is used to compute the sentence start date." *State v. Muldrow*, No. 107,291, 2013 WL 1149704, at *2 (Kan. App. 2013) (unpublished opinion). A lawful sentence is effective once announced from the bench. See *State v. Mason*, 294 Kan. 675, 677, 279 P.3d 707 (2012). Once a lawful sentence has been imposed, the sentencing court has no jurisdiction to modify the sentence except to correct arithmetic or clerical errors. *State v. Guder*, 293 Kan. 763, 766, 267 P.3d 751 (2012). "A journal entry that imposes a sentence at variance with that pronounced from the bench is erroneous and must be corrected to reflect the actual sentence imposed." *Abasolo v. State*, 284 Kan. 299, Syl. ¶ 3, 160 P.3d 471 (2007). "The court may correct an illegal sentence at any time." K.S.A. 2018 Supp. 22-3504(1). However, a defendant's claim that the district court awarded insufficient jail time credit does not amount to a challenge to an illegal sentence. *State v. Lofton*, 272 Kan. 216, Syl. ¶ 1, 32 P.3d 711 (2001).

Here, it is unclear what happened. By default, the correct sentence would be that announced from the bench: 129 days of jail credit. But if the district court was correcting a clerical or mathematical error when it recorded 213 days of credit on the journal entries, then the 213 days of credit would be the correct sentence, as the district court had jurisdiction to correct arithmetic or clerical errors. However, the record lacks a nunc pro tunc order, transcript, or any other indication of why the change was made. Neither party has raised the issue of the amount of jail time credit on appeal. We have considered the

13

matter using both jail time credit figures and determined that it does not change the outcome.

If we use the 129 day figure for the jail credit, Montgomery's sentence was as follows: 24 months (which equals 730 days), minus 129 days credit for time served, equals 601 days of time to be served from the date of sentencing. Under K.S.A. 2018 Supp. 21-6821(b)(2)(C), Montgomery was eligible for 20% good-time credit, and the district court identified this correctly during sentencing. The Kansas Department of Corrections (KDOC) calculates good time credits based upon a 360-day year. K.A.R. 44-6-108(a). Using this method a 24-month sentence equates to 720 days, and 20% of 720 days is 144 days. Thus, the minimum amount of time Montgomery could serve in prison after sentencing was 730 - 129 - 144 = 457 days, which is greater than one year. However, KDOC may have used the jail time credit of 213 days to calculate the sentence begin date. See K.A.R. 44-6-134(a) (2018 Supp.) ("If only the number of days of jail credit earned is contained in the journal entry, the records officer shall compute the sentence begins date by subtracting jail credit from the date of sentencing."). Even so, the length of imprisonment would not be less than 1 year (730 - 213 - 144 = 373). Under *Grebe*, the district court did not err by failing to consider community service as a method of payment because Montgomery's sentence, calculated either way, indicates he would have been unable to perform the community service within a year of sentencing. See 46 Kan. App. 2d at 744.

Montgomery correctly identifies on appeal that the district court said at sentencing that "to the extent that there is any time left on your misdemeanor, by the time you're released you can certainly do work release if they bring you back here and you're in there." According to Montgomery, this pronouncement would only be possible if the district court foresaw a scenario in which his prison sentence could be completed in less than a year following sentencing because his jail sentence was only 12 months in duration. This argument fails because the district court's language is based on an error of

14

fact. Montgomery was not convicted of any misdemeanors in this case; he was convicted of felony DUI and felony second-time possession of marijuana.

Finally, Montgomery argues that the fact he was released in December 2017, less than 12 months after sentencing in April 2017, is proof that the district court erred by failing to consider community service as a method of payment. The only evidence he supplies is a link to his KASPER page that shows he was released in December 2017. However, this argument also ignores the fact that the determination of the method of payment is made at the time of sentencing. The district court cannot predict the application of any possible program credits that would allow KDOC to release a person prior to a date calculated by the district court.

In sum, Montgomery's sentence as pronounced from the bench foreclosed the possibility of his release within a year of sentencing. The district court did not err by failing to consider community service as a method of payment for his $2,500 fine.

III.   DID THE DISTRICT COURT ERR BY IMPOSING BIDS ATTORNEY FEES?

Montgomery next argues that the district court committed reversible error by failing to give meaningful consideration to his ability to pay BIDS attorney fees before imposing said fees. Consideration of this issue requires interpretation of K.S.A. 2017 Supp. 22-4513, which is a question of law subject to unlimited review. *Robinson*, 281 Kan. at 539.

Under *Robinson*, when assessing BIDS fees during sentencing, courts "must consider the financial resources of the defendant and the nature of the burden that payment will impose *explicitly*, stating on the record how those factors have been weighed in the court's decision." 281 Kan. at 546.

Here, during sentencing, the district court originally announced it would require Montgomery to pay both Keck's and Todd's BIDS attorney fees. Todd objected, citing *Robinson*. He acknowledged that Montgomery was working, "got financial," and was out on bond but said that since the district court ordered Montgomery to serve a 24-month sentence, he would be unable to work for the next 24 months and unable to pay the fees, so the fees should therefore be waived. The district court then asked Todd what his fee would be; Todd said it was $547. The district court then asked, "I am guessing Ms. Keck's would be the same?" and Todd responded, "I believe it would be the same on there."

The district court stated on the record that, when assessing attorney fees, it considered the fact that Montgomery was "working, and he's got financial, he's out on bond." The district court asked Todd, "He's got nothing saved up?" Todd did not answer the question, instead responding, "I think he is going to be unemployed as of right now." The district court noted that Montgomery "obviously has work skills. He's going in for 24 months minus 20 percent. He will be right back out at some time and ought to be able to pay and earn a living." The district court then waived Todd's attorney fee but ordered Montgomery to pay Keck's attorney fee. The journal entries of sentencing read that Montgomery owed "$ ord" for his BIDS attorney fee.

Montgomery claims on appeal that there is no indication in the record of what Keck's fee was or if it was indeed the same as Todd's waived fee. He argues that "it is impossible to see how [the district court] could impose Ms. Keck's fee in compliance with *Robinson* when the record does not disclose what that fee is. Specifically, how could the district court have properly considered Mr. Montgomery's ability to pay or the burden of imposing an unknown fee?" Montgomery cites two cases to support his argument, neither of which deal with the propriety of an unspecified BIDS fee. In the past decade, however, our Supreme Court and other panels of this court have addressed this issue multiple times.

16

Under K.S.A. 22-4513(b), sentencing courts must "take account of the financial resources of the defendant and the nature of the burden that payment of such sum will impose" before assessing BIDS fees. In *State v. Stevens*, 285 Kan. 307, 330, 172 P.3d 570 (2007), *overruled on other grounds by State v. Ahrens*, 296 Kan. 151, 290 P.3d 629 (2012), our Supreme Court held that "[w]hen the district court initially fails to tax a specific amount of attorney fees claimed by BIDS, then obviously that court is unable to adequately evaluate the amount of such unknown sum that the defendant is able to pay." Subsequent decisions from this court further elaborated on the specificity required. In *State v. Allen*, No. 105,522, 2012 WL 603276, at *5 (Kan. App. 2012) (unpublished opinion), a panel of this court remanded for reassessment of fees when the district court ordered Allen to pay five percent of the attorney fees submitted and approved by voucher but the amount was not mentioned at sentencing or in the journal entry. The panel remanded because even though the sentencing court "may have known the actual amount of its 5% order, [and] may have considered the burden on Allen of repaying such a sum," Allen did not have a chance to address his ability to pay the exact amount. 2012 WL 603276, at *5. Similarly, in *State v. Pelsor*, No. 105,080, 2011 WL 6310457, at *3 (Kan. App. 2011) (unpublished opinion), a different panel of this court remanded for reassessment of fees when the district court ordered Pelsor to pay 5% of the BIDS fees incurred in her defense but never determined the exact amount owed.

As discussed above, the sentence announced from the bench controls over the journal entries that differ. See *Abasolo*, 284 Kan. 299, Syl. ¶ 3. At sentencing there was an exchange between Todd and the district court wherein Todd agreed that Keck's fee "would be the same" as his $547 fee. The district court later ordered that Montgomery pay Keck's fee. This court construes the exchange and the order of the district court to require that Montgomery pay a $547 BIDS fee. Absent his argument that the BIDS fee was not specified, Montgomery's argument is reduced to a claim that the district court failed to give meaningful consideration to his financial resources and the nature of the burden of the fee.

17

Contrary to Montgomery's claims on appeal, this case is not like *State v. Drayton*, 285 Kan. 689, 175 P.3d 861 (2008). There, the sentencing judge herself found that since Drayton would be imprisoned for the next 25 years, his financial condition did not make it likely that he could pay the assessed BIDS attorney fees of $7,110. As the State correctly points out on appeal, the district court here did inquire about Montgomery's financial resources and ability to pay and incorporated the responses into its given reasoning for ordering payment of Keck's fees. The district court stated on the record that, when assessing fees, it considered the fact that Montgomery was "working, and he's got financial, he's out on bond." The district court asked Todd, "[Montgomery]'s got nothing saved up?" and Todd did not answer the question, instead responding, "I think he is going to be unemployed as of right now." The district court also stated that Montgomery "obviously has work skills. He's going in for 24 months minus 20 percent. He will be right back out at some time and ought to be able to pay and earn a living." The district court considered the amount of the fee ($547), Montgomery's financial resources demonstrated by his ability to bond out, the fact that he had been working since bonding out, and his job skills and continued ability to earn a living after serving his sentence. Therefore, this court affirms the district court's assessment of BIDS fees.

IV.    DID THE DISTRICT COURT ABUSE ITS DISCRETION BY DENYING MONTGOMERY A DISPOSITIONAL DEPARTURE OR A LARGER DURATIONAL DEPARTURE?

On appeal, Montgomery argues that the district court abused its discretion by not departing further in sentencing. He claims that no reasonable person would agree with the district court's decision in light of the numerous substantial and compelling reasons he put forth for departing. He again presents the arguments he made at sentencing:  he accepted responsibility for the crimes, he had enrolled in therapy, he had a daughter to support, he had mental health issues, he had remained sober on house arrest, and he had returned to church.

18

"[T]he appellate court reviews the district court's ruling on the departure decision under an abuse of discretion standard." *State v. Jolly*, 301 Kan. 313, 324, 342 P.3d 935 (2015). A district court abuses its discretion if its decision was arbitrary, fanciful, or unreasonable or was based on an error of fact or law. *State v. Jones*, 306 Kan. 948, Syl. ¶ 7, 398 P.3d 856 (2017). A district court does not abuse its discretion when ruling on a motion for sentencing departure if "'[r]easonable people could agree with the district court's assessment of whether the mitigating circumstances were substantial and compelling.'" *State v. Ballard*, 289 Kan. 1000, 1008, 218 P.3d 432 (2009) (quoting *State v. Ortega-Cadelan*, 287 Kan. 157, 165-66, 194 P.3d 1195 [2008]). The party arguing that the district court abused its discretion bears the burden to show an abuse of discretion occurred. *Robinson,* 303 Kan. at 90.

Here, the presumptive sentencing range for Montgomery's second-time possession of marijuana conviction was: high—36 months, medium—34 months, and low—32 months. The conviction carried a presumptive prison sentence. The sentencing range for Montgomery's DUI conviction was from 90 days to one year. Montgomery moved for a dispositional departure to probation, including Therapeutic Community treatment followed by work release. In the alternative, he moved for a durational departure.

In support of his sentencing departure motion, Montgomery argued that he had remained sober while on house arrest. He also argued that he had been diagnosed with obsessive compulsive disorder and acute anxiety, and that these disorders contributed to his crimes. Montgomery spoke on his own behalf, saying that he was taking accountability for his crimes, and he realized that he did not like who he was when he drank. He stated that he was "involved in therapy" and returning to church.

The State assented to a durational departure to 24 months in prison but opposed a dispositional departure. The State cited Montgomery's long history of drunk driving and

19

his refusal to take accountability for his actions or change his behavior. The State noted that Montgomery's repetitive DUIs made him a public safety risk.

The district court denied Montgomery's motion for a dispositional departure, noting that "[y]ou need some help with the mental health counseling and treatment, but you've had several of these same convictions to be able to do that and it hasn't taken it seems." The district court also expressed concern that, if it were to grant Montgomery a departure to probation, he would continue to drink and drive and imperil others. The district court did, however, proceed with the State's recommendation and allowed a durational departure; it sentenced Montgomery to 24 months on the possession conviction and 12 months on the DUI, to run concurrent.

In this case, the district court acknowledged Montgomery's mental health concerns and desire to accept responsibility and turn his life around. The district court also, however, stated that his criminal record made clear that he had had numerous prior opportunities to turn his life around but had failed to do so. The district court noted that probation was too much of a public safety risk, as Montgomery's record showed that he continually drove under the influence despite several prior convictions. This court finds that a reasonable person could agree with the district court's assessment. Therefore, this court affirms Montgomery's sentence.

Affirmed.